J-A02009-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| C.W.C. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| S.E.C.-W. | |
| Appellant | No. 1932 EDA 2014 |

Appeal from the Order Entered June 3, 2014
In the Court of Common Pleas of Philadelphia County
Family Court at No(s): OC1100720

BEFORE:  PANELLA, J., LAZARUS, J., and WECHT, J.

MEMORANDUM BY LAZARUS, J.:                **FILED APRIL 10, 2015**

S.E.C.-W. ("Mother") appeals from the June 3, 2014 order, entered in the Court of Common Pleas of Philadelphia County, transferring primary physical custody of the parties' two youngest children to C.W.C. ("Father") and awarding Mother partial physical custody.[1]  The court also granted both parties shared legal custody, granted Father's two petitions for contempt, found Mother in contempt of the custody order, and awarded Father $2500 in counsel fees.  After our review, we affirm on the opinion authored by the Honorable Diane Thompson.

Mother and Father are the parents of three children, M.C. (born March 1999), E.C. (born June 2002), and C.C. (born February 2005).  The original

---

[1] The court ordered that Mother retain primary physical custody of the parties' oldest child, M.C.

custody order was entered in 2005, in Virginia, ("the Virginia order"); that order granted primary physical custody of the three children to Mother and granted her request to relocate to Philadelphia subject to Father's partial physical custody on alternating weekends and specific holidays. The Virginia order also included a clause to alter arrangements and provide for a make-up weekend in the event that weather made travel dangerous on one of Father's scheduled custodial weekends (the "Weather Clause").

Both Mother and Father remarried. Father moved to Dundalk, Maryland, outside of Baltimore, which is approximately a two-hour commute from Philadelphia.[2]

On June 11, 2013, Mother filed a petition to modify custody. After four custody hearings, including an *in camera* interview with the children on November 14, 2013, a hearing on Father's petition for special relief, as well as an additional hearing on April 29, 2014 on Father's petition for contempt[3], the court entered the June 3, 2014 order.[4] Mother appealed that order.

_____

[2] The trial court recognized that this is not a relocation case.

[3] The court found Mother willfully refused to transport the children to Father on one of his scheduled custodial Fridays, and held Mother in contempt and ordered that she pay Father $2,500 in counsel fees pursuant to the parties' July 31, 2012 agreement.

[4] Mother filed a petition for reconsideration of this June 3, 2014 order. The trial court failed to expressly grant reconsideration and, instead, entered an order scheduling a hearing. *See* Pa.R.A.P. 1701- Note (if trial court fails to enter order "expressly granting reconsideration," within 30 days, the trial court's loses power to act on the motion for reconsideration); *Cheathem v.*
*(Footnote Continued Next Page)*

Mother raises the following issues for our review:

1. Whether the trial court abused its discretion and erred as a matter of law and fact when it transferred primary custody of the parties' younger children to Father?

2. Whether the trial court abused its discretion and erred as a matter of law and fact when it ordered the relocation of the parties' two younger children to Maryland?[5]

3. Whether the trial court abused its discretion and erred as a matter of law and fact when it precluded Mother from submitting testimony and evidence in support of her case for custody and father's contempt?

4. Whether the trial court abused its discretion and erred as a matter of law and fact when it found Mother in willful contempt of the custody order and directed Mother to pay Father's counsel fees?

5. Whether the trial court abused its discretion and erred as a matter of law and fact in not finding Father in willful contempt of the custody order?

We first set forth the legal standards that guide our appellate review of this child custody case.

_____

(Footnote Continued) ⸻⸻⸻⸻⸻

***Temple Univ. Hosp***., 743 A.2d 518 (Pa. Super. 1999) (trial court must expressly grant reconsideration, not just set hearing date, within time allowed for filing an appeal, in order to toll time for taking appeal). The trial court, therefore, lost jurisdiction to act on Mother's petition for reconsideration. In any event, Mother filed a timely notice of appeal from the June 3, 2014 order on June 25, 2014. ***See*** Pa.R.A.P. 903.

[5] ***See supra*** note 2. Contrary to Mother's claim, the relocation factors do not apply herein. Neither party raised relocation during the proceedings. Further, Mother's challenge is to the change in primary custody of the two younger children; the distance between the parties has remained the same.

[O]ur scope of review is broad in that we are not bound by deductions and inferences drawn by the trial court from the facts found, nor are we required to accept findings which are wholly without support in the record. On the other hand, our broad scope of review does not authorize us to nullify the fact-finding function of the trial court in order to substitute our judgment for that of the trial court. Rather, we are bound by findings supported in the record, and may reject conclusions drawn by the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

Further, on the issues of credibility and weight of the evidence, we defer to the findings of the trial judge. Additionally, appellate interference is allowed only where it is found that the custody order is manifestly unreasonable as shown by the evidence of record.

*Jordan v. Jackson*, 876 A.2d 443, 449 (Pa. Super. 2005) (internal citations, quotations omitted). *See In re: R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010); *M.P. v. M.P.*, 54 A.3d 950 (Pa. Super. 2012). Additionally,

[w]e consistently have held that the discretion that a trial court employs in custody matters should be accorded the utmost respect, given the special nature of the proceeding and the lasting impact the result will have on the lives [of] the parties concerned. Indeed, the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record.

*Jackson v. Beck*, 858 A.2d 1250, 1254 (Pa. Super. 2004). *See A.H. v. C.M.*, 58 A.3d 823, 825 (Pa. Super. 2012).

Furthermore, we note that

The primary concern in any custody case is the best interests of the child. The best-interests standard, decided on a case-by-case basis, considers all factors that legitimately have an effect upon the child's physical, intellectual, moral, and spiritual well-being.

- 4 -

*Saintz v. Rinker*, 902 A.2d 509, 512 (Pa. Super. 2006) (citing *Arnold v. Arnold*, 847 A.2d 674, 677 (Pa. Super. 2004)).

The trial court determined Mother's home is less stable than Father's home.[6] The court also determined that Mother was interfering with Father's relationship with the children, that Father would be more likely to encourage contact between Mother and children, that Father would be more likely to maintain a consistent and nurturing relationship with the children, and that Mother's animosity toward Father may be exacerbating the children's psychological issues. The court concluded, therefore, that it was in the children's best interest to transfer primary custody of the two younger children to Father and maintain primary custody of the oldest child, M.C., with Mother. The court stated that this would give the two younger children "a fresh start in a more stable and supportive household . . . while continuing their relationship with Mother." Trial Court Opinion, *supra* at 33. The court further noted that it did not disturb Mother's custody of M.C. in light of M.C.'s age, her psychological issues,[7] which the court found had a

---

[6] Mother and Stepfather both suffer from depression. Mother admitted herself to Horsham Clinic for four days, overwhelmed by the custody litigation. At the February 24, 2014 hearing, Mother testified she had been laid off from her job and was currently seeking a new position. Stepfather, who was an Episcopal priest at All Saints Episcopal Church, is no longer employed there and is currently involved in a defamation suit against the church. Mother and Stepfather are also undergoing marriage counseling.

[7] M.C. was diagnosed with generalized anxiety disorder.

disruptive effect on the younger children, her conflict-ridden relationship with Father, and her consistently expressed desire not to see Father.

After our review of the parties' briefs, the record, and the relevant case law, as well as the factors set forth at 23 Pa.C.S. § 5328(a) of the Child Custody Act, we conclude that Judge Thompson's findings are supported in the record and her conclusions of law are proper in light of those findings. *In re: R.J.T.*, *supra*; *Jordan v. Jackson*, *supra*. **See** Trial Court Opinion, 9/2/14, at 11-15. We, therefore, affirm the custody order based on Judge Thompson's opinion. We instruct the parties to attach a copy of that opinion in the event of further proceedings.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 4/10/2015

- 6 -

COPIES SENT
PURSUANT TO Pa.R.C.P. 236(b)

SEP 02 2014

FIRST JUDICIAL DISTRICT OF PA
USER I.D.:

FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FAMILY DIVISION

| | | |
|---|---|---|
| C████ W. C███████, | : | TRIAL COURT DOCKET NO. 0C1100720 |
| PETITIONER/APPELLEE | : | |
| | : | DESIGNATED "CHILDREN'S |
| v. | : | FAST TRACK" |
| | : | |
| S████ E. C███████-W███████K, | : | SUPERIOR COURT OF PENNSYLVANIA |
| RESPONDENT/APPELLANT | : | DOCKET NO. 1932 EDA 2014 |

## OPINION

Appellant, Sarah E. Caswell-Warnick ("Mother"), appeals from the order of June 3, 2014, in which this court transferred primary physical custody of the parties' two youngest children, Emily Caswell (DOB June ██, 2002) and Gole Caswell (DOB February ██, 2005), to Collin W. Caswell ("Father") who resides in Maryland, and awarded partial physical custody to Mother. In addition, the order of June 3, 2014, provides that Mother shall continue to have primary physical custody of the parties' oldest child, Morgan Caswell (DOB March ██, 1999), and Father shall have partial physical custody. The order further provides that the parties shall share legal custody of all three children. This court also granted Father's Petitions for Contempt filed January 29, 2013, and March 14, 2014, and found Mother to be in contempt of the custody order and awarded Father $2500 in counsel fees pursuant to the terms of the parties' agreed order of July 31, 2012.

## PROCEDURAL HISTORY

This matter was initiated in this jurisdiction on April 20, 2011, with the registration of a detailed agreed custody order from Prince William County, Virginia, which was

I hereby certify that the foregoing is a true copy of the original as same appears in the records of this Court this

date ___9-2-14___

by: ___J. M██████___
Clerk of Court

1

entered on February 22, 2010 ("the Virginia Order"). The Virginia Order entered in 2010 superseded the first custody order entered in Virginia on December 19, 2005, and the final visitation order entered by that court on July 17, 2006. The Virginia Order provided in pertinent part that Mother would maintain primary physical custody and was permitted to relocate with the children to Philadelphia subject to Father's partial physical custody on alternating weekends and specific holidays as set forth in the order. In addition, the parties were to continue to have shared legal custody of the children. The Virginia Order also contained specific provisions addressing transportation arrangements for exchange of the children including a clause designating sites for pick-up and return of the children and a clause allowing for modifications in the custody schedule in the event of bad weather ("Weather Clause"). The Weather Clause provided as follows:

> If either party reasonably determines that the weather would make driving for Father's alternating weekend visitation exchange dangerous, then the parties shall agree upon a make up visitation weekend for the Father to occur within thirty (30) days of the missed weekend. If the parties do not agree upon the weekend immediately following the missed weekend (which would otherwise be Mother's normal weekend), then the make up visitation shall occur on the next weekend that would otherwise be Mother's normal weekend.

On June 29, 2011, and September 28, 2011, as the result of two separate Petitions for Expedited Relief filed by Mother, this court entered orders modifying the transportation arrangements between the parties with respect to the drop-off and pick-up locations for exchange of the children, with the exchange to occur at the respective parties' homes, but did not disturb the other provisions of the Virginia Order. On January 17, 2012, pursuant to an order entered by the supervising judge of Family Court, this matter was scheduled to be listed for a protracted hearing and all custody matters in this

2

case were assigned to this judge. In addition, the order provided for mental health evaluations by the court psychologist on both parties and all three children.

On July 31, 2012, the protracted hearing on the cross-petitions for contempt filed by the parties did not take place as the parties were able to reach an agreement, which was entered as an order of court. The agreed order of July 31, 2012, amended the Virginia Order in part by setting forth a new schedule for holidays and establishing a new site for return exchange of the children to Mother at the Chesapeake House in Maryland, a rest stop along I-95, roughly half-way between the parties' homes. Further, as part of the agreed order of July 31, 2012, each party withdrew their respective contempt petitions with the provision that "if either party files additional contempt petitions and are found in contempt of court, they shall be sanctioned to pay punitive damages, to the other party, in the amount of $2,500 plus counsel fees, if applicable." The parties further agreed to attend individual counseling to promote better communication and co-parenting between them.

On December 27, 2012, Mother filed a *pro se* Petition to Modify Custody[1] and a Petition for Contempt of Custody. Thereafter, on January 29, 2013, Father filed a *pro se* Answer and Counterclaim to Mother's Petition for Contempt and an Answer to Mother's Petition to Modify Custody. On March 19, 2013, Mother through her attorney filed an additional Petition to Modify Custody seeking sole legal and physical custody of the children. These petitions were consolidated for the hearings held before this court, which

---

[1] At the first hearing on August 21,2013, Mother withdrew her Petition to Modify Custody filed on December 27, 2012, through an oral motion by her counsel as this petition dealt solely with a request for modification of transportation arrangements due to Mother's medical issues that no longer existed.

3

took place on August 21, 2013, September 30, 2013, November 14, 2013, and February 24, 2014. Furthermore, this court held an additional hearing on April 29, 2014, on Father's Petition for Contempt filed through counsel on March 14, 2014, and Mother's *pro se* Answer and Counterclaim filed on March 28, 2013.

On June 11, 2013, prior to the first hearing on Mother's Petition to Modify Custody and the parties' respective Petitions for Contempt of Custody, this Court held a hearing on Father's Petition for Special Relief for Enforcement of Subpoenas to Attend and Testify filed on March 11, 2013. Father, through his counsel, had subpoenaed the Custodian of Medical Records for Horsham Clinic and Mother's therapist as well as the Custodian of Records of St. Christopher Children's Hospital, and the Custodian of Records of St. Christopher Pediatric Urgent care. At the June 11, 2013 hearing, the medical records, having been certified by the custodian of records for each entity, were submitted to the court for *in camera* review. After receipt of the records, this court determined that, pursuant to the Mental Health Procedures Act, 50 P.S. Section 7111(a), and the holding in Gates v. Gates, 967 A.2d 1024 (Pa. Super. 2009), this court and counsel were precluded from reviewing Mother's mental health records or allowing them to be introduced into evidence without written consent from Mother and the records were returned to Mother. We also determined that the records from St. Christopher Children's Hospital were discoverable and that these records should be made available to the parties and their respective counsel.

At the conclusion of four custody hearings, a hearing on November 14, 2013, for an *in camera* interview of the children, and a hearing on Father's motion for special relief,

4

this court entered an order on February 24, 2014, kept the record open for receipt of the psychological evaluation of ~~Meagan Caswell~~, and held the decision on the case under advisement. This court also heard testimony and admitted evidence in an additional hearing on April 29, 2014, on Father's petition for contempt of the custody order and Mother's Answer and Counterclaim. On June 3, 2014, this court entered its final order as follows:

THIS COURT CONSIDERED THE TESTIMONY OF BOTH MOTHER AND FATHER AND THEIR WITNESSES AND THE IN CAMERA TESTIMONY OF THE PARTIES' THREE CHILDREN AND EVALUATED THE CREDIBILITY AND DEMEANOR OF ALL WITNESSES, REVIEWED AND CONSIDERED THE DOCUMENTS ADMITTED INTO EVIDENCE BY EACH PARTY, AND EVALUATED ALL THE FACTORS IN 23 PA. C.S. SECTION 5328, AND IN 23 PA. C.S. SECTION 5337. ALL PRIOR ORDERS ARE VACATED, EXCEPT FOR LANGUAGE IN PRIOR ORDERS THAT IS INCORPORATED INTO THIS ORDER. THIS COURT ENTERS THE FOLLOWING ORDER REGARDING THE PARTIES' OUTSTANDING PETITIONS FOR CONTEMPT AND TO MODIFY CUSTODY:

THIS COURT FINDS MOTHER IN WILLFUL CONTEMPT OF THE CUSTODY ORDER OF THIS COURT AS A RESULT OF HER WILLFUL REFUSAL TO TRANSPORT THE PARTIES' CHILDREN TO FATHER ON FRIDAY, FEBRUARY 28, 2014. WITHIN NINETY (90) DAYS FROM THE DATE OF THIS ORDER, MOTHER SHALL PAY THE SUM OF TWENTY-FIVE HUNDRED DOLLARS ($2,500) IN COUNSEL FEES TO FATHER'S ATTORNEY, DAVID STEERMAN, ESQUIRE, PURSUANT TO THE TERMS OF THE PARTIES' ORDER BY AGREEMENT ENTERED ON JULY 31, 2012.

I. LEGAL CUSTODY:

A. MOTHER, SARAH CASWELL WARWICK, AND FATHER, COLLIN W. CASWELL, SHALL CONTINUE TO SHARE LEGAL CUSTODY OF THE MINOR CHILDREN, MORGAN CASWELL (DOB MARCH ##, 1999), EMILY CASWELL (DOB JUNE ##, 2002), AND COLE CASWELL (DOB FEBRUARY ##, 2005).

B. BOTH PARENTS SHALL HAVE EQUAL ACCESS TO EACH OF THE CHILDREN'S SCHOOL RECORDS, INCLUDING BUT NOT LIMITED TO PROGRESS REPORTS, INTERIM REPORTS, TEST RESULTS. CUSTODIAL PARENT SHALL SCAN ALL LETTERS AND NOTICES RECEIVED FROM THE CHILDREN'S SCHOOL(S) AND EMAIL THEM TO THE NON-CUSTODIAL PARENT WITHIN THREE DAYS OF RECEIPT.

C. BOTH PARENTS SHALL HAVE EQUAL ACCESS TO EACH OF THE CHILDREN'S MEDICAL, DENTAL, AND PSYCHOLOGICAL RECORDS.

D. EACH PARENT SHOULD CONTINUE WITH INDIVIDUAL THERAPY TO ADDRESS THEIR ANIMOSITY TOWARDS EACH OTHER.

E. MORGAN CASWELL SHALL CONTINUE WITH HER INDIVIDUAL THERAPY UNTIL DISCHARGED BY THERAPIST.

F. EXTRA-CURRICULAR AND SCHOOL ACTIVITIES

EACH PARENT SHALL FIRST CONSULT WITH THE OTHER PARENT PRIOR TO ENROLLING ANY OF THE CHILDREN IN EXTRACURRICULAR ACTIVITIES. EACH PARENT MAY ENROLL ANY OF THE CHILDREN INTO APPROPRIATE EXTRACURRICULAR ACTIVITIES, AFTER CONSULTING WITH THE OTHER PARENT, DURING HIS OR HER PRIMARY CUSTODIAL PERIODS. EACH PARENT SHALL INFORM THE OTHER PARENT OF ALL EXTRACURRICULAR AND SCHOOL EVENTS THAT THE CHILDREN ARE PARTICIPATING IN AS SOON AS THAT PARENT KNOWS OF THE EVENT.

II. PHYSICAL CUSTODY:

A.      EFFECTIVE AUGUST 31, 2014, THIS COURT TRANSFERS PRIMARY PHYSICAL CUSTODY OF ~~EMILY CASWELL~~ AND ~~COLE CASWELL~~ TO FATHER WHO RESIDES IN MARYLAND. FATHER SHALL BE PERMITTED TO ENROLL ~~EMILY CASWELL~~ AND ~~COLE CASWELL~~ IN HIS LOCAL SCHOOL DISTRICT FOR 2014-2015 SCHOOL YEAR PRIOR TO AUGUST 31, 2014.

B.      MOTHER SHALL CONTINUE TO HAVE PRIMARY PHYSICAL CUSTODY OF ~~MORGAN CASWELL~~ IN PHILADELPHIA, PA.

DURING THE CHILDRENS' SCHOOL YEAR:

C.      MOTHER SHALL HAVE PARTIAL PHYSICAL CUSTODY OF ~~EMILY~~ AND ~~COLE~~ ON ALTERNATING WEEKENDS DURING THE CHILDREN'S SCHOOL YEAR, EFFECTIVE THE FIRST FRIDAY AFTER LABOR DAY AT 8:00 P.M. UNTIL THE FOLLOWING SUNDAY AT 8:00 P.M. IF THE MINOR CHILDREN DO NOT HAVE SCHOOL ON A DAY/DAYS THAT ARE CONNECTED TO MOTHER'S WEEKEND·FOR ANY REASON, AND WITH ADVANCE NOTICE TO FATHER, MOTHER'S PARTIAL PHYSICAL SHALL COMMENCE AT 8:00 PM ON THE CHILDREN'S LAST DAY OF SCHOOL AND SHALL END AT 8:00 PM ON THE DAY BEFORE SCHOOL RESUMES.  BY WAY OF EXAMPLE AND ILLUSTRATION ONLY: IF THE CHILDREN DO NOT HAVE SCHOOL ON A FRIDAY AND/OR A MONDAY CONNECTED TO ONE OF MOTHER'S WEEKENDS, FATHER SHALL HAVE CUSTODY FROM 8:00 PM ON THURSDAY AND/OR UNTIL 8:00 PM ON MONDAY.

D.      FATHER SHALL HAVE PARTIAL PHYSICAL CUSTODY OF ~~MORGAN~~ IN MARYLAND ONE WEEKEND EACH MONTH DURING HIS WEEKENDS WITH ~~EMILY~~ AND ~~COLE~~. MOTHER SHALL NOTIFY FATHER IN WRITING BY THE FIRST DAY OF EACH MONTH OF

7

WHICH WEEKEND MORGAN WILL TRAVEL TO MARYLAND TO SPEND WITH FATHER AND HER SIBLINGS. FATHER SHALL HAVE AT LEAST TWO WEEKS OF CUSTODY WITH MORGAN DURING SUMMER VACATION WHEN HE HAS CUSTODY OF EMILY AND COLE.

DURING SUMMER VACATION:

E. IN 2014, FATHER SHALL HAVE CUSTODY OF ALL THREE CHILDREN FROM JUNE 20, 2014, AT 8:00 P.M. UNTIL JUNE 27, 2014, AT 8:00 P.M. MOTHER SHALL HAVE PHYSICAL CUSTODY OF EMILY AND COLE DURING SUMMER RECESS, FOR THE FIRST TWO WEEKS OF JULY, BEGINNING AT 8:00 P.M. ON THE FRIDAY PRIOR TO JULY 4TH, AND ENDING 14 DAYS LATER (IN 2014, JUNE 27-JULY 11, AND COMPARABLE DATES IN SUBSEQUENT YEARS) AND THE FIRST TWO WEEKS OF AUGUST, FROM THE FIRST FRIDAY AT 8:00 P.M. UNTIL 14 DAYS LATER (IN 2014, AUGUST 1 - AUGUST 15) AND COMPARABLE DATES IN SUBSEQUENT YEARS). FATHER SHALL HAVE CUSTODY OF ALL THREE CHILDREN THE REMAINING TIME IN JULY AND AUGUST, UNTIL LABOR DAY WEEKEND.

D. HOLIDAYS AND SCHOOL VACATION BREAKS:

MOTHER: IN 2014 AND EVEN-NUMBERED YEARS; FATHER IN 2015 AND ODD-NUMBERED YEARS:

FROM 8:00 PM ON THE LAST DAY OF SCHOOL PRIOR TO EASTER/SPRING VACATION UNTIL 8:00 PM ON THE THURSDAY BEFORE EASTER SUNDAY.

THANKSGIVING VACATION FROM THE WEDNESDAY PRECEDING THANKSGIVING DAY AT 8:00 PM AND ENDING ON SUNDAY AFTER THANKSGIVING DAY AT 8:00 PM;

CHRISTMAS/WINTER BREAK FROM 8:00PM ON DECEMBER 27TH UNTIL 8:00PM ON THE DAY BEFORE SCHOOL RESUMES.

FATHER: IN 2014 AND EVEN-NUMBERED YEARS; MOTHER IN 2015 AND ODD-NUMBERED YEARS:

THURSDAY BEFORE EASTER SUNDAY AT 8:00 PM UNTIL EASTER SUNDAY AT 8:00 PM.

CHRISTMAS/WINTER BREAK FROM 8:00 PM ON THE LAST DAY OF SCHOOL BEFORE THE BREAK BEGINS UNTIL 8:00 PM ON DECEMBER 27TH.

EVERY YEAR FOR FATHER'S DAY/MOTHER'S DAY:

FATHER SHALL HAVE CUSTODY OF THE CHILDREN ON FATHER'S DAY WEEKEND EACH YEAR FROM FRIDAY AT 8:00 PM UNTIL SUNDAY AT 8:00 PM.

MOTHER SHALL HAVE CUSTODY OF THE CHILDREN ON MOTHER'S DAY WEEKEND EACH YEAR FROM FRIDAY AT 8:00 PM UNTIL SUNDAY AT 8:00 PM.

ALL HOLIDAY AND CUSTODIAL PERIODS SET FORTH ABOVE SHALL TAKE PRECEDENCE OVER REGULAR WEEKEND CUSTODY, BUT SHALL NOT ALTER THE PATTERN OF REGULAR ALTERNATE WEEKEND CUSTODY.

E. TRANSPORTATION:

MOTHER AND FATHER SHALL EXCHANGE THE CHILDREN, INCLUDING M~~ORGAN~~ FOR FATHER'S CUSTODIAL PERIOD, AT THE BEGINNING AND END OF EACH PARENT'S CUSTODIAL PERIOD AT THE CHESAPEAKE HOUSE SERVICE CENTER ON 1-95. PARTIES MAY CHANGE THE LOCATION OF THE EXCHANGE ON CERTAIN OCCASIONS IF THEY MUTUALLY AGREE IN WRITING. EITHER MOTHER OR FATHER MAY DESIGNATE A RESPONSIBLE ADULT TO TRANSPORT THE CHILDREN OR TO BE PRESENT FOR THE EXCHANGE OF THE CHILDREN PROVIDED THEY GIVE THE OTHER PARTY ADVANCED NOTICE.

F. TELEPHONIC AND ELECTRONIC COMMUNITCATIONS

9

1. CHILDREN MAY USE THEIR INDIVIDUAL MOBILE TELEPHONES, THE PARENTS' LANDLINES OR MOBILE TELEPHONES, OR ANY ELECTRONIC DEVICES TO CONTACT EITHER PARENT OR STEPPARENT WHILE IN THE OTHER PARENT'S CUSTODY. THE NON-CUSTODIAL PARENT SHALL NOT CONTACT THE CHILDREN WHILE IN THE CUSTODIAL PARENT'S CUSTODY, UNLESS THERE IS AN EMERGENCY.

2. THE COURT ADMONISHES BOTH PARTIES REGARDING THEIR COMMUNICATIONS WITH THE CHILDREN AND DIRECTS THAT NEITHER PARTY SHALL DISCUSS THE CUSTODY LITIGATION WITH ANY OF THE CHILDREN, INCLUDING MAKING COMMENTS TO THE CHILDREN ABOUT THE CONTENTS OF THIS ORDER. NEITHER PARTY NOR STEP-PARENTS SHALL MAKE ANY DEROGATORY REMARKS ABOUT THE OTHER PARENT OR STEP-PARENT IN THE PRESENCE OF THE CHILDREN OR VIA TEXT MESSAGING, TELEPHONE CALLS, OR ELECTRONIC COMMUNICATION. VIOLATION OF THIS ORDER SHALL RESULT IN IMPOSITION OF SEVERE SANCTIONS.

G. EACH PARENT SHALL PROVIDE THE OTHER WITH ADVANCED WRITTEN NOTICE IF THE CHILDREN WILL BE SLEEPING OVERNIGHT OUTSIDE OF THE STATE OF THEIR RESIDENCES, INCLUDING THE DATES OF TRAVEL, THE ADDRESS(ES) WHERE THE CHILDREN WILL BE STAYING AND TELEPHONE NUMBERS WHERE THE CHILDREN CAN BE REACHED.

III. JURISDICTION AND RELOCATION:

A. PENNSYLVANIA RETAINS JURISDICTION OF ALL CUSTODY PLEADINGS BY EITHER PARENT.

B. UNTIL SUCH TIME AS THE MINOR CHILDREN ARE FULLY EMANCIPATED, EACH PARENT SHALL AT ALL TIMES KEEP THE OTHER PARENT APPRISED OF HIS OR HER RESIDENTIAL ADDRESS AND TELEPHONE NUMBER (BOTH LAND LINE, IF ANY, AND CELL

10

PHONE) AND SHALL PROMPTLY NOTIFY THE OTHER PARENT AND THE COURT IN WRITING, IN ACCORDANCE WITH 23 PA. C.S. SECTION 5337, PRIOR TO AN INTENDED CHANGE THEREOF (BY PROVIDING THE INTENDED DATE OF CHANGE OF ADDRESS, THE SPECIFIC STREET, ROUTE ADDRESS, CITY OR COUNTY, STATE AND ZIP CODE AND PHONE NUMBER OF THE INTENDED NEW ADDRESS), IN THE EVENT THAT EITHER PARTY INTENDS TO PERMANENTLY CHANGE HIS OR HER RESIDENCE.

C. NEITHER SHALL MOVE THEIR RESIDENCE MORE THAN 15 MILES FARTHER AWAY THAN THE PRESENT DISTANCES BETWEEN THEIR CURRENT RESIDENCES. IF EITHER PARTY DETERMINES THAT IT IS NECESSARY TO RELOCATE HIS OR HER RESIDENCE, PARTIES ARE OBLIGATED TO COMPLY WITH PENNSYLVANIA'S RELOCATION STATUTE AT 23 PA. C.S. SECTION 5337 AND THE APPLICABLE PENNSYLVANIA RULES OF CIVIL PROCEDURE.

IV. SECTION 5328 FACTORS:

THE COURT MADE THE FOLLOWING FINDINGS PURSUANT TO THE FACTORS FOUND IN SECTION 5328 OF THE CUSTODY ACT:

(1) WHICH PARTY IS MORE LIKELY TO ENCOURAGE AND PERMIT FREQUENT AND CONTINUING CONTACT BETWEEN THE CHILD AND ANOTHER PARTY. THE COURT FINDS THAT FATHER IS MORE LIKELY TO ENCOURAGE AND PERMIT FREQUENT AND CONTINUING CONTACT BETWEEN THE CHILDREN AND MOTHER. THE COURT FINDS THAT MOTHER HAS DELIBERATELY INTERFERED WITH FATHER'S CUSTODY OF THE CHILDREN, NOT ONLY REGARDING HIS TIME SPENT WITH THE CHILDREN, BUT THAT SHE HAS INTEREFERED WITH THE QUALITY OF THE TIME THAT HE SPENDS WITH THE CHILDREN.

(2) THE PRESENT AND PAST ABUSE COMMITTED BY A PARTY OR MEMBER OF THE PARTY'S HOUSEHOLD, WHETHER THERE IS A CONTINUED RISK OF HARM TO THE CHILD OR

11

AN ABUSED PARTY AND WHICH PARTY CAN BETTER PROVIDE ADEQUATE PHYSICAL SAFEGUARDS AND SUPERVISION OF THE CHILD. DESPITE MOTHER'S FILING A PETITION FOR PROTECTION FROM ABUSE ON BEHALF OF MINOR CHILD MORGAN AGAINST FATHER DURING THE PENDENCY OF THIS CUSTODY LITIGATION, THIS FACTOR DOES NOT APPLY AS THE PETITION WAS WITHDRAWN AND NO FINAL ORDER WAS ENTERED. MOREOVER, NO CREDIBLE EVIDENCE WAS PRESENTED THAT FATHER POSES A RISK OF HARM TO THE CHILDREN.

(3) THE PARENTAL DUTIES PERFORMED BY EACH PARTY ON BEHALF OF THE CHILD. BOTH PARENTS HAVE DEMONSTRATED THAT THEY ARE CAPABLE OF AND HAVE BEEN PERFORMING PARENTAL DUTIES ON BEHALF OF EACH CHILD.

(4) THE NEED FOR STABILITY AND CONTINUITY IN THE CHILD'S EDUCATION, FAMILY LIFE AND COMMUNITY LIFE. THE COURT CAREFULLY CONSIDERED THIS FACTOR PRIOR TO TRANSFERRING CUSTODY, THE COURT GAVE WEIGHT TO THE OVERALL PHYSICAL AND EMOTIONAL WELL-BEING OF EACH CHILD. THE COURT DETERMINED THAT THE CHILDREN HAVE STABILITY IN THEIR FAMILY LIFE AND COMMUNITY LIFE WITH FATHER.

(5) THE AVAILABILITY OF EXTENDED FAMILY. EACH PARENT HAS REMARRIED. THERE WAS LITTLE TESTIMONY OF OTHER EXTENDED FAMILY, SO THIS FACTOR WAS NOT RELEVANT.

(6) THE CHILD'S SIBLING RELATIONSHIPS. THE PARTIES HAVE THREE BIOLOGICAL CHILDREN TOGETHER. FATHER AND HIS WIFE HAVE A TWO-YEAR-OLD SON. DUE TO THE PSYCHOLOGICAL CIRCUMSTANCES REGARDING THE PARTIES' ELDEST CHILD, MORGAN,

12

THE COURT DETERMINED THAT THE BEST INTERESTS OF THE TWO YOUNGER CHILDEN WOULD BE SERVED BY TRANSFERRING CUSTODY OF THEM TO FATHER.

(7) THE WELL-REASONED PREFERENCE OF THE CHILD, BASED ON THE CHILD'S MATURITY AND JUDGMENT. NEITHER EMILY NOR COLE EXPRESSED A PREFERENCE. MORGAN, ON THE OTHER HAND, CONSISTENTLY HAS EXPRESSED HER DESIRE NOT TO SEE FATHER. THIS COURT DETERMINED THAT HER PREFERENCE, ALTHOUGH NOT PARTICULARLY WELL-REASONED, INTERFERES SUBSTANTIALLY WITH FATHER'S CUSTODY OF THE TWO YOUNGER CHILDREN.

(8) THE ATTEMPTS OF A PARENT TO TURN THE CHILD AGAINST THE OTHER PARENT, EXCEPT IN CASES OF DOMESTIC VIOLENCE WHERE REASONABLE SAFETY MEASURES ARE NECESSARY TO PROTECT THE CHILD FROM HARM. THIS COURT FINDS THAT MOTHER HAS MADE CONSISTENT ATTEMPTS TO THWART CUSTODY BETWEEN FATHER AND THE CHILDREN, AND IN THE SITUATION WITH MORGAN, HAS SUCCEEDED.

(9) WHICH PARTY IS MORE LIKELY TO MAINTAIN A LOVING, STABLE, CONSISTENT AND NURTURING RELATIONSHIP WITH THE CHILD ADEQUATE FOR THE CHILD'S EMOTIONAL NEEDS. THE COURT FINDS THAT FATHER IS MORE LIKELY TO MAINTAIN A LOVING, STABLE, CONSISTENT AND NURTURING RELATIONSHIP WITH THE CHILDREN WHICH IS MORE THAN ADEQUATE FOR THEIR EMOTIONAL NEEDS.

(10) WHICH PARTY IS MORE LIKELY TO ATTEND TO THE DAILY PHYSICAL, EMOTIONAL, DEVELOPMENTAL, EDUCATIONAL AND SPECIAL NEEDS OF THE CHILD. BOTH PARTIES HAVE DEMONSTRATED THEIR CAPABILITIES IN THIS AREA. HOWEVER, THIS COURT DETERMINED THAT MOTHER'S ANIMOSITY TOWARDS FATHER SEEMS TO BE EXACERBATING THE CHILDREN'S PSYCHOLOGICAL ISSUES.

13

(11) THE PROXIMITY OF THE RESIDENCES OF THE PARTIES. MOTHER NOW RESIDES IN PHILADELPHIA. FATHER RESIDES OUTSIDE OF BALTIMORE, IN DUNDALK, MARYLAND. THE DISTANCE IS 110 MILES AND IS APPROXIMATELY A TWO-HOUR DRIVE. IT IS SIGNIFICANT TO NOTE THAT BEFORE MOTHER MOVED TO PHILADELPHIA, SHE RESIDED IN PRINCE WILLIAM COUNTY, VIRGINIA, WHERE THE PARTIES APPEARED FOR RELOCATION HEARINGS. ON FEBRUARY 22, 2010, THE PARTIES' FINAL ORDER WAS ENTERED AND SUBSEQUENTLY REGISTERED IN PHILADELPHIA COUNTY, PENNSYLVANIA.

(12) EACH PARTY'S AVAILABILITY TO CARE FOR THE CHILD OR ABILITY TO MAKE APPROPRIATE CHILD-CARE ARRANGEMENTS. BOTH PARENTS' AVAILABILITY TO CARE FOR THE CHILDREN HAS BEEN ADEQUATE.

(13) THE LEVEL OF CONFLICT BETWEEN THE PARTIES AND THE WILLINGNESS AND ABILITY OF THE PARTIES TO COOPERATE WITH ONE ANOTHER. A PARTY'S EFFORT TO PROTECT A CHILD FROM ABUSE BY ANOTHER PARTY IS NOT EVIDENCE OF UNWILLINGNESS OR INABILITY TO COOPERATE WITH THAT PARTY. THIS COURT FINDS THAT THE PARTIES HAVE A DIFFICULT TIME IN COMMUNICATING BASIC INFORMATION REGARDING THE CHILDREN. MOTHER TENDS TO MAKE DECISIONS UNILATERALLY, SUCH AS IN HER DECISIONS TO WITHHOLD FATHER'S CUSTODY, AND FREQUENTLY CHANGES HER MIND ABOUT DECISIONS. FATHER TENDS TO MAKE CLEAR DECISIONS, BUT DOES NOT ALWAYS COMMUNICATE HIS DECSIONS TO MOTHER AS QUICKLY AS SHE WOULD LIKE HIM TO DO.

(14) THE HISTORY OF DRUG OR ALCOHOL ABUSE OF A PARTY OR MEMBER OF A PARTY'S HOUSEHOLD. THIS FACTOR DOES NOT APPLY.

(15) THE MENTAL AND PHYSICAL CONDITION OF A PARTY OR MEMBER OF A PARTY'S HOUSEHOLD.

~~MOTHER~~ HAS BEEN EVALUATED BY A PSYCHOLOGIST WHO DIAGNOSED HER WITH AN ANXIETY DISORDER. MOTHER TESTIFIED THAT SHE BELIEVES THAT THE TWO YOUNGER CHILDREN ARE SUFFERING FROM ANXIETY, WHICH FATHER CONTESTED. MOTHER ALSO TESTIFIED ~~CHILD~~ HAS BEEN DIAGNOSED BY A PHYSICIAN WITH ENCOPRESIS.

(16) ANY OTHER RELEVANT FACTOR. THIS COURT CONSIDERED THE FACT THAT FATHER HAS BEEN RESIDING IN MARYLAND DURING THE PENDENCY OF THE PREVIOUS CUSTODY ORDERS. THE COURT ALSO CONSIDERED THE PREVIOUS ORDERS, INCLUDING THE RELOCATION ORDER FROM THE COURT IN VIRGINIA. THIS COURT DETERMINED THAT THE RELOCATION FACTORS IN SECTION 5337 OF THE CUSTODY ACT DO NOT APPLY. ESSENTIALLY, THE COURT IS REVERSING THE PRIMARY CUSTODY OF THE TWO YOUNGER CHILDREN FROM MOTHER TO FATHER.

Thereafter, on June 25, 2014, Mother through her counsel, filed a Petition for Reconsideration of the June 3, 2014 Order and an Application for Stay of Order Pending Appeal. On the same date, Mother's counsel filed the instant timely Children's Fast Track appeal. On July 9, 2014, Father's counsel filed responses to Mother's Petition for Reconsideration and Application for Stay of Order Pending Appeal. On July 18, 2014, this Court granted Mother's Petition for Reconsideration. Due to the fact that this Court's order granting reconsideration was not entered within the thirty (30) day timeframe under Pa. R.A.P. 903 for the filing of an appeal, this court no longer had jurisdiction to proceed in this matter. However, pursuant to Pa. R.A.P. 1701(b)(1), we retained

jurisdiction to proceed on Mother's Application for Stay of Order Pending Appeal, which was denied after hearing oral argument at the hearing on July 31, 2014.

### FACTUAL BACKGROUND

Mother and Father were formerly married and resided in Prince William County, Virginia, with their three children, Morgan Caswell, age fourteen, Emily Caswell, age twelve, and Cole Caswell, age nine. Since the parties' separation, the children have resided primarily with Mother. After the parties divorced, Mother remarried in December 2009, and moved to Philadelphia, Pennsylvania, with the children to join her new husband, Jeremy Warnick ("Stepfather"). The Virginia Order, entered by agreement of the parties, allowed Mother to relocate with the children. Mother's household consists of Stepfather and the three children. In addition, eight weeks a year, Mother's eight year old stepdaughter, Abigail, lives with them. (Notes of Testimony, ("N.T.") 8/21/13,p. 5).

Mother works for Arbitron recruiting panelists to participate in radio and television ratings. Mother conducts her administrative duties from her home office, but is also required to travel on field work to try to recruit people to participate in ratings. (N.T. 8/21/13, at 7). Mother testified that she works out of her home approximately three weeks per month and is traveling doing field work on an average of two to two-and-one-half days per month while the children are in her custody. (N.T. 8/21/13, at 7-8, 101-103). Mother further testified that her work schedule is flexible so that she is able to arrange her travel during those weekends when the children are with Father and, on those days that she is working and unavailable to care for the children, Stepfather is available to care for them. (N.T. 8/21/13, at 7-8, 122). At the time of the February 24, 2014, Mother had been laid off from work and was looking for a new position. (N.T. 2/24/14, at 32-33).

16

Mother also has issues with depression and testified to admitting herself voluntarily to the Horsham Clinic in August 2012 for four days because she was feeling overwhelmed by the ongoing custody litigation. (N.T. 8/21/13, at 75-76). Mother is currently being treated with anti-depressants. (N.T. 8/21/13, at 76).

Stepfather is an Episcopal priest, and was employed with the All Saints Episcopal Church for a period of two years. (N.T. 9/30/13, at 3-4). Stepfather is no longer employed by the church and is currently involved in a defamation suit against the church. (N.T. 8/21/13, at 9-10, 122). At the time of the August 21, 2013, hearing, Stepfather was unemployed but had previously been working in sales for several years. (N.T. 8/21/13, at 9-10). At the February 24, 2014, hearing, Stepfather was working twelve hour shifts at a job one and one half hours away and only spending four nights a week at home. (N.T. 2/24/14, at 34). Stepfather testified that he is currently being treated for depression and that the stress resulting from termination of his position with the church was impacting his relationship with Mother. (N.T. 9/30/13, at 11-12, 23-24). Furthermore, Mother testified that she and Stepfather were currently involved in marriage counseling. (N.T. 8/21/13, at 74).

Father resides in Dundalk, Maryland, where he lives with his current Wife, A████ C██████ ("Stepmother'), and their eighteen-month-old son, K███. Father has been employed outside the home with a defense contractor working in the information technology field for the last three years. (N.T. 8/21/13, at 194). Father's work hours are typically from 7:00 a.m. to 3:00 p.m., but Father testified to having a lot of flexibility in his hours. (N.T. 8/21/13, at 194). Stepmother works fulltime from 9:00 a.m. to 5:00 p.m. in

17

marketing for a physician's magazine, where she has been employed for seven years. (N.T. 8/21/13, at 194), (N.T. 9/30/13, at 116). Stepmother testified that she has known the Ca███ children since 2007 and that they have a good relationship. (N.T. 9/30/13, at 109-111).

Mother testified that after moving to Philadelphia with the children, M█████ skipped a grade in school because she had been in a gifted program in Virginia and there was no gifted program in the school she would be attending in Philadelphia. (N.T. 8/21/13, at 6). M█████ currently attends school at the Science Leadership Academy and Mother stated that M█████ was having some problems adjusting to high school. (N.T. 8/21/13, at 5, 130), (See Ex. F-7, 8/21/13). Mother further stated E███ does well in school and would be entering the sixth grade and that C███ is an excellent student with A's and B's and would be entering the third grade. (N.T. 8/21/13, at 65-66). In addition, the children are involved in numerous activities with M█████ participating in cheerleading, Girl Scouts, dance and the Gay/Straight Alliance at school. (N.T. 8/21/13, at 65-66). E███'s activities include gymnastics, singing in the school choir and Girl Scouts and C███ is involved in Cub Scouts and soccer. (N.T. 8/21/13, at 67-68). Although Father resides in Maryland, he made the effort to transport C███ to his soccer games in Philadelphia, during his custodial periods and, on occasion, attended the children's events. (N.T. 9/30/13, at 91, 95-96).

The oldest child, M█████, was experiencing ongoing psychological problems during the course of the multiple hearings before this court. Mother testified at the hearing on August 21, 2013, that M█████ was having problems adjusting to her new school and

18

dealing with her conflict-ridden relationship with Father. (N.T. 8/21/13, at 5, 155), (See Ex.F-7, 8/21/13). In addition, Mother testified that M██████ had been in therapy "off and on" with three different therapists since moving to Philadelphia from northern Virginia three and one-half years ago. (N.T. 8/21/13, at 110-111). Moreover, both parties became aware of tweets posted on M██████'s Twitter account in March of 2013, stating, "I wish I were dead," "Guys, I'm dropping out of high school to be a stripper," and "I'm so emotionally done; is this over yet." (N.T. 8/21/13, at 86-89, 209) (See Ex. F-1, 8/21/13). Father testified that upon seeing M██████'s tweets threatening to harm herself, he contacted Mother to determine what could be done to help M██████ but Mother did not want to engage in a discussion with Father and told him the situation was being dealt with. (N.T. 8/21/13, at 209-210). In addition, Mother acknowledged receiving a text from Stepfather on August 18, 2013, expressing concern about M██████ and suggesting that M██████ see a psychiatrist after Stepfather found blood in her bed that was "not menstrual blood." (N.T. 8/21/13, at 128-129). Mother testified that she did not inform Father about the incident because she believed the blood was "the result of bug bites." (N.T. 8/21/13, at 128-129), (N.T. 9/30/13, at 62), (See Ex. F-20, 9/30/13).

Father stated that his relationship with M██████ had become "strained" and since July 2012, the relationship had diminished to the point where there was no regular communication between them. (N.T. 8/21/13, at 195-196). Father attributed as one of the causes for his poor relationship with M██████ to his belief that Mother was projecting her anger towards Father onto M██████. (N.T. 8/21/13, at 195-196). Furthermore, Father testified to numerous phone calls between Mother and M██████ during his custody

19

periods where afterwards Morgan would be agitated to the point where it would have a negative impact on the remainder of her visit and disrupt Father's custodial time with the other children. (N.T. 8/21/13, at 196-197). As a result, Father decided in February or March 2013, to take the children's phones away during his custody time and only allow the use of phones on a limited basis. (N.T. 8/21/13, at 197-198). Mother admitted that she and Morgan had frequent phone contact during Father's custody periods prior to the implementation of Father's "no phone policy" and that she would usually text Father to ask when Emily or Cole would be available by phone, or, on occasion receive calls from them directly from Father's mobile phone. (N.T. 8/21/13, at 16, 94-97).

Mother testified to the deterioration of Father's relationship with Morgan as the direct result of Father's abusive language towards Morgan (N.T. 8/21/13, at 20, 28, 33-34), Father's disparate treatment of Morgan by favoring the other children with more gifts and Father's exclusion of Morgan from family activities as a form of punishment. (N.T. 8/21/13, at 39-41). Mother further stated that Father refused to communicate with her on these issues so she encouraged Morgan to communicate her feelings directly with Father. (N.T. 8/21/13, at 34). Mother testified to an incident on January 20, 2013, when the children were on a visit with Father. At the time of the incident, Mother was on a phone call with Morgan and testified that Morgan was "very upset" because she "had had a very difficult weekend" at Father's house. (N.T. 8/21/13, at 43). According to Mother's version of the event, Father came in to Morgan's room while Morgan was on the phone and asked her if she wanted to go to the bakery with the rest of the family. When Morgan refused, Father dragged Morgan by her left arm off her bed and down the stairs and

20

across the lawn to the family vehicle. (N.T. 8/21/13, at 45). Mother stated that by the time the call dropped, it "sounded like a physical altercation was taking place." (N.T. 8/21/13, at 45). As a result, Mother contacted the Baltimore police, who arrived on the scene. (N.T. 8/21/13, at 46). Mother testified that she did call Father to determine what happened but that she never received an explanation from Father. (N.T. 8/21/13, at 49).

Father recounted the incident on January 20, 2013, somewhat differently stating that he entered Morgan's bedroom because she was "yelling" and obviously upset while on a phone call with Mother that lasted in excess of twenty minutes. (N.T. 8/21/13, at 226-227). After Morgan refused to end the call, Father grabbed the phone from Morgan and left the room. (N.T. 8/21/13, at 227). Later that afternoon, Father had plans to go on a family outing to a bakery and wanted to include Morgan. When Morgan refused to go, Father grabbed one of Morgan's hands but Morgan became resistive. (N.T. 8/21/13, at 227-228). As a result a struggle ensued where Father had to physically remove Morgan from the house into the family vehicle. (N.T. 8/21/13, at 228-229). Father explained his actions stating that he had safety concerns leaving Morgan alone in the house and that "when a parent, me especially, tells her what to do, especially when it's well within the realm of reasonable, she needs to comply." (N.T. 8/21/13, at 228-229).

When Morgan returned from her visit with Father, Mother stated that she took her to St. Christopher urgent care center because Morgan was complaining of severe pain in her left wrist. (N.T. 8/21/13, at 46-47). (See Ex. M-1, M-2, 8/21/13). As a result of this incident, Mother filed a Protection from Abuse action ("PFA") on behalf of Morgan against Father on January 22, 2013. (See Ex. M-6, 8/21/13). A temporary PFA order for

21

protection and eviction was entered against Father on the same day. Thereafter, on February 25, 2013, this court entered an order temporarily suspending Father's custodial time with Morgan. The temporary PFA was modified by agreement of the parties on March 19, 2011, to protection only, to allow Father to participate in therapy with Morgan. On August 21, 2013, the PFA was withdrawn. (See Ex. M-7, 8/21/13).

Following this court's order of February 25, 2013, the children were enrolled in counseling. Mother chose to take the children to Adam Berman, Psy.D., who met with the children and prepared a treatment summary for each child. (N.T. 8/21/13, p. 156), (See M-3, M-4, M-5, 8/21/13). Dr. Berman testified at the August 21, 2013, hearing that he had twelve sessions with Morgan with the first session taking place on April 8, 2013. (N.T. 8/21/13, p. 174). In addition, Dr. Berman conducted five sessions with Emily and two sessions with Cole. (N.T. 8/21/13, at 175). Dr. Berman stated that the frequency of his sessions with Morgan was related to the concerns regarding her school performance and other difficulties she was experiencing. (N.T. 8/21/13, at 175-176). In the overall findings of his treatment summary for Morgan, Dr. Berman concluded in part that Morgan has "a higher than average overall intelligence" and "no suicidal ideation". (See Ex. M-3, 8/21/13). Further, Dr. Berman stated that, in spite of the fact that he was able to make progress related to Morgan's school work and socialization, Morgan was adamant in her refusal to joint counseling sessions involving her Father. (N.T. 8/21/13, at 177-178). Dr. Berman stated that he had a few joint sessions involving the children and Mother and Stepfather, when he thought it was appropriate. (N.T. 8/21/13, at 183). Although Father was not involved in any of the sessions with the children, Dr. Berman stated that Father

22

contacted him on a regular basis to obtain information on the progress of the sessions. (N.T. 8/21/13, at 184).

On August 22, 2013, this court entered an order, which provided in pertinent part that none of the children were to have use of their individual mobile phones, the parents' land lines or any other electronic devices to contact either parent or stepparent while in the other parent's custody unless the children are with the custodial parent for more than four consecutive days. The order also prohibited either parent from having telephone, text message or email contact with the children while the children are in the other parent's custody. Further, this court established a set schedule for contact by the children with the noncustodial parent after the children have been with the other parent for more than four days. Father testified that subsequent to the institution of the ban on the children's electronic devices, the quality of his custodial time improved and everyone was getting along well. (N.T. 9/30/13, at 23-24).

The order of August 22, 2013, vacated a portion of this court's previous order of February 25, 2013, suspending Father's custody of Morgan as a result of the withdrawal of the PFA on behalf of Morgan. The order of August 22, 2013, also required Father to participate in therapy with Morgan on a regular basis with Adam Berman, Psy.D., who had previously been involved in individual therapy with all three children, or any subsequent licensed psychologist or therapist.

As the result of this court's order of August 22, 2013, Father participated in joint therapy sessions with Morgan and Dr. Berman. Father testified that the first session, which was arranged by Mother, went poorly and that Morgan was "belligerent" and

23

"disrespectful" to both Father and Dr. Berman. (N.T. 9/30/13, at 24-25). Morgan later told Father that she was upset that she had to be removed early from school to attend the session and miss her dance class. (N.T. 9/30/13, at 26). Father attended a second counseling session with Morgan, but the preceding weekend Morgan had been with Father, which he stated she was "very interactive" and "pleasant." (N.T. 9/30/13, at 22-23). At the second session, Father stated that he was surprised that Morgan's behavior was equally as bad as at the first session. (N.T. 9/30/13, at 29). Father stated that he was expecting a difficult weekend afterwards with Morgan but it never materialized as the visit went well. (N.T. 9/30/13, at 31). Furthermore, Father testified that Mother disregarded the existing court order and interfered with his joint therapy session on October 16, 2013, by not permitting Father to pick Morgan up from school and take her out to dinner prior to the session[2]. (N.T. 11/14/13, at 63-64). Father stated that instead, Mother drove Morgan to the therapy appointment and waited in the parking lot the entire session. (N.T. 11/14/13, at 63). Father stated that this was his last appointment with Dr. Berman as Mother unilaterally terminated the sessions with Dr. Berman and made contact with Children's Hospital of Philadelphia ("CHOP") to get Morgan a psychiatric appointment. (N.T. 11/14/13, at 65), (N.T. 4/29/14, at 141-142). It is not in dispute that both parties were in agreement that Morgan obtain a psychiatric evaluation

---

[2] The October 8, 2013 order provided in pertinent part as follows:
FATHER SHALL PARTICIPATE IN THERAPY WITH MORGAN ON A REGULAR AND CONSISTENT BASIS WITH ADAM BERMAN, PSY.D., OR ANY OTHER SUBSEQUENT LICENSED PSYCHOLOGIST OR THERAPIST. FATHER SHALL SCHEDULE HIS APPOINTMENTS DIRECTLY WITH THE THERAPIST IN ACCORDANCE WITH THE THERAPY SCHEDULE FOR MORGAN. FATHER SHALL PROMPTLY NOTIFY MOTHER OF THE DATES AND TIMES OF THERAPY. MORGAN SHALL PARTICIPATE IN THE THERAPY SESSIONS WITH FATHER. FATHER SHALL PICK UP MORGAN AFTER SCHOOL FOR THERAPY APPOINTMENTS AND SHALL RETURN HER TO MOTHER'S HOME AFTER DINNER AND IN TIME FOR ANY OF MORGAN'S EVENING EXTRACURRICULAR ACTIVITIES.

at CHOP. (N.T. 11/14/13, at 68-69). The parties also agreed that Morgan would participate in counseling with Dr. Vogelson.

This court conducted an *in camera* interview with the children on November 14, 2013, with counsel for both parties present. During the interview, Morgan stated that she did not want to continue therapy sessions with Dr. Berman because she felt that he had a "bias" in favor of her Father. (N.T. 11/14/13, at 13-14). Morgan also stated that she had been experiencing panic attacks since September of 2013. (N.T. 11/14/13, at 34). Morgan further stated that the panic attacks usually occurred on Fridays during her last period in school prior to her visits with her Father and before therapy sessions with her Father. (N.T. 11/14/13, at 37-39). In interviewing Emily and Cole, this court found that they enjoyed their custodial time with Father and that they did not harbor any animosity or negative feelings towards Father. This court did not ask either Cole or Emily a direct question as to their preference, but instead sought to determine by other questions how each child adjusted during his or her custodial periods with Father. This court also invited both attorneys to ask questions of the children.

On November 18, 2013, this court entered an order for a full psychological evaluation to be conducted on Morgan which was eventually conducted at The Children's Hospital of Philadelphia ("CHOP"). The CHOP evaluation indicated a diagnosis of generalized anxiety disorder and recommended that Morgan continue in individual therapy as well as in family therapy with her Father. (See C-1, 4/29/14). The CHOP evaluation also recommended that the parents consider co-parenting therapy to foster a better relationship between them to enable them to work together and support one

25

another in parenting M█████. (See C-1, 4/29/14). Father testified that, in spite of the fact that both parties had agreed to and cooperated in the CHOP evaluation, he was unable to gain access to the completed evaluation due to the attempts by Mother and M█████ to prevent it from being released to him. (N.T. 4/29/14, at 156-157). However, since M█████'s evaluation was court-ordered, this court directed that it be made available to both parties and their counsel.

Mother contended that C██y and En██y were exhibiting signs of anxiety as well as M█████. Mother stated that all three children had been in therapy off and on since moving to Pennsylvania. (N.T. 8/21/13, at 110). Furthermore, Mother stated that she wanted En██y to undergo a psychological evaluation after some concerns were raised at En██y's school conference. (N.T. 4/29/14, at 115-117). Father stated that he was concerned that Mother was fabricating the instances of anxiety experienced by C██e and En██y in an attempt to alienate the children from him. (N.T. 4/29/24, at 29-30). Father further stated that he received emails from Mother in which she claimed that the children have great anxiety prior to and after visits with Father. (N.T. 4/29/14, at 29-30), (See Ex. K, Ex. L to Father's Petition for Contempt filed 3/14/14). Moreover, Father testified that during his partial custody C██e and En██y do not exhibit any signs of anxiety. (N.T. 4/29/14, at 29-30). Mother also claims that C██e is experiencing encopresis in her home and Father testified that he has never seen any signs of C██e having any difficulties with his bowel movements in his home. (N.T. 4/29/14, at 37). Father stated that his overriding concern is that Mother's issues with Father "are more than just bleeding into the

26

relationship I have with the children" and ultimately could negatively impact his relationship with E█████y and C██e. (N.T. 4/29/14, at 39-40).

Father alleged that there were numerous instances where Mother attempted to unilaterally interfere with his custody periods. Subsequent to the filing of the PFA action on behalf of M█████n and the entry the temporary PFA prohibiting Father's contact with M██████, Mother suspended Father's custody with C██e and E██y as well. On January 30, 2013, Mother sent Father an email stating "I WILL NOT be releasing any of the kids to you until after the resolution of the Protection from Abuse Order and the pending criminal and CPS investigations." (See Ex. F-15, 9/30/13). Father testified that he was denied his court ordered custody periods from January 30, 2103 until the entry of this court's order of February 25, 2013. (N.T. 9/30/13, at 34-35).

Father testified that on the morning of February 28, 2014, which was the Friday of his designated weekend with the children, Mother sent him an email stating that due to the forecast of a snow storm, she would be exercising the Weather Clause to postpone his upcoming weekend. (N.T. 4/29/14, at 17-18), (See Ex. E, Father's Petition for Contempt filed 3/14/14). Father further stated that the weather conditions on the February 28, 2014, weekend would not have prevented Mother from transporting the children to Father nor did snow arrive by Sunday on the day of the children's return to Mother. (N.T. 4/29/14, at 21). Father testified that Mother exercised the Weather Clause over his strenuous objections and made no attempt to work out an earlier return of the children, if necessary, due to the snow. (N.T. 4/29/14, at 21-23). Father stated that as a result his plans to have a joint birthday celebration for C██e and K██e over the weekend were

27

cancelled as well. (N.T. 4/29/14, p.22). Mother testified that it was reasonable for her to exercise the Weather Clause based on her previous experience on December 8, 2013, when she had to transport the children to the Chesapeake House during a snow storm and it took her five hours of travelling on dangerous roads. (N.T. 4/29/14, at 124-125). Mother further stated that Father had ignored all her prior attempts to communicate with him in order to make alternate arrangements for the December 8, 2013, weekend. (N.T. 4/29/14, at 124-125). This court did not find Mother's testimony to be credible.

## LEGAL ANALYSIS

Mother raises the following issues on appeal in her 1925(b) Statement:

1. The Honorable Court abused its discretion and erred as a matter of law and fact when it transferred primary custody of the parties' younger children to Father.
2. The Honorable Court abused its discretion and erred as a matter of law and fact when it ordered relocation of the parties' two younger children to Maryland.
3. The Honorable Court abused its discretion and erred as a matter of law and fact when it precluded Mother from submitting testimony and evidence in support of her case for custody and Father's contempt.
4. The Honorable Court abused its discretion and erred as a matter of law and fact in finding Mother in willful contempt of the custody order and directing Mother to pay Father's counsel fee.
5. The Honorable Court abused its discretion and erred as a matter of law and fact in not finding Father in willful contempt of the custody order.

The standard of review to be exercised by an appellate court in custody matters is a gross abuse of discretion. Richards v. Hepfer, 764 A.2d 623 (Pa. Super. 2000). In applying this standard the appellate court must accept the findings of the trial court if they are supported by competent evidence and cannot substitute its own factual determinations. In addition, on issues of credibility and weight of the evidence, the appellate court must

28

defer to the trial court judge who had the opportunity to observe the witnesses first-hand. C.R.F., III v. S.E.F., 45 A.3rd, 441, 443 (Pa. Super. 2012).

The primary concern in any custody determination is the best interests of the child, which must be decided on a case-by-case basis and which must take into consideration all the factors that legitimately have an effect upon the child's physical, intellectual, moral and spiritual well-being. Saintz v. Rinker, 902 A.2D 509, 512 (Pa. Super. 2006). Moreover, as part of the best interest analysis, it is incumbent upon the trial court to consider the relevant factors set forth at 23 Pa.C.S. Section 5328 (a). E.D. v. M.P., 33 A.3d 73, 80 (Pa.Super. 2011).

In the instant case, over the course of five days of hearings, this court took into consideration the credibility of the parties and their respective witnesses, reviewed the exhibits and interviewed the three children *in camera*. The oldest child, Morgan, was interviewed on two separate occasions by this court as the result of her ongoing emotional and psychological issues as evidenced in the record of these proceedings. This court entered its order of June 3, 2014, after thorough and thoughtful consideration of all the relevant factors under Section 5328(a) and expressly stated its analysis of the relevant factors in its order.

Mother avers in her first issue on appeal that this court erred as a matter of law and fact when it transferred primary physical custody of the parties' two younger children to Father. In applying the relevant factors under Section 5328, this court determined that Father's household offers more stability for the children. Both Father and Stepmother hold stable jobs with somewhat flexible hours, which enable them to

29

be available for the children on a more consistent basis. Conversely, Mother's household does not offer the same stability as both she and Stepfather were employed in jobs requiring travel from the home. In addition, this court has concerns regarding the mental stability of Mother and Stepfather and how this might interfere with their parenting obligations. Both Mother and Stepfather testified to being treated for depression. (N.T. 8/21/13 at 76), (N.T. 9/30/13 at 11-12). During the course of this custody proceeding, Mother voluntarily admitted herself into the Horsham Clinic as the result of feeling overwhelmed. (N.T. 8/21/13 at 75-76). Moreover, Mother and Stepfather had separated at one point and were involved in marriage counseling at the time of these proceedings. (N.T. 8/21/13 at 74). Consequently, this court has concerns that the stress in Mother's household has had a negative impact on the two younger children, who have already shown signs of anxiety in Mother's household. The record shows that G████ is currently experiencing encopresis in Mother's household and E████ is having issues in school. Based on these findings, this court determined not only that Father is more likely to more likely to maintain a consistent and nurturing relationship with the two younger children, but that the children will thrive under his custodial care.

This court considered Mother's animosity towards Father and her pervasive attempts to alienate the children from Father. The record is replete with instances where Mother intentionally interfered with the Father's relationship with the children. In direct contravention to the existing custody order, Mother suspended Fathers' partial custody with C████ and E████ during January and February of 2013, because of the temporary protection order against Father on behalf of M██████. Another instance

30

occurred on February 28, 2014, when this court told Mother's counsel to tell Mother to transport the children for Father's custody weekend. Nevertheless, Mother refused claiming the forecast of a snowstorm on the following Sunday, March 2nd, prevented her. As a result, Father did not have custody of E███y and C██ that weekend and they missed C███'s and K██'s birthday celebrations which Father had planned in advance.

This court also considered Mother's attempts to interfere with the quality of the time that Father spends with the children. Prior to the court-ordered ban on electronic devices, Mother had frequent communications with the children, especially M█████, which were disruptive to Father's custody periods. Mother also interfered with Father's attempts to improve his relationship with M█████ by unilaterally terminating the court-ordered joint therapy sessions with Dr. Berman and by denying Father any access to medical and psychiatric information concerning M█████.

The Superior Court has held that a custodial parent's obstruction of the noncustodial parent's right to visit a child may serve as a basis for a change in custody. Kozlowksi v. Kozlowski, 524 A.2d 995, 997 (Pa.Super. 1987) (citing Pamela J.K. v. Roger D.J., 419 A.2d 1301 (Pa. Super. 1980)). While this court is mindful that willful interference with court-ordered visitations cannot be the basis for an "automatic" change of custody, we took into careful consideration the advantages and risks of a change in custody and determined that the advantages are in favor of a transfer of primary custody of E███y and C██ to Father. See, English v. English, 469 A.2d 270, (Pa. Super. 1983), See also, Rosenberg v Rosenberg, 504 A.2d 350, 353 (Pa.Super. 1986). This court found that transfer of primary physical custody of E████ and C██ to Father would not result in potential harm or disruption to their lives, but to the contrary, this

31

transfer would remove the children from the toxic environment of Mother's home. Moreover, the children are familiar with Father's home and neighborhood since they have spent significant periods of time with Father since the parties' separation in 2005. The children have strong ties to their Stepmother, A⬛, stepbrother, K⬛e, and to the Baltimore area as a result of the time they have spent with Father.

The Superior Court has long recognized that the policy of not separating siblings is only one factor and does not take precedence over the ultimate analysis in which the best interest factors are applied. Johns v. Cioci, 865 A.2d 931, 942 (Pa.Super. 2004) (citing E.A.L. v. L.J.W., 662 A.2d 1109, 1118 (1995); Cardamone v. Elshoff, 659 A.2d 575, 583-84 (1995); M.D. v. B.D., 485 A.2d 813, 816-817 (1984). In Watters v. Watters, 757 A.2d 966, 969 (Pa.Super. 2000), the Superior Court held that absent "compelling reasons" the policy that siblings should be raised together should not be disturbed. In determining whether compelling reasons exist, a court must "ask whether the evidence indicates that it was necessary to separate the children and whether the evidence was forceful in this regard." Id. This court carefully considered that the evidence including testimony was forceful over the course of nearly two years and determined that compelling reasons in fact do exist to separate E⬛y and C⬛e from their older sister, M⬛. This court implemented an order that would afford substantial contact between the siblings on weekends, holidays, and during summer vacation. This court also determined that this separation would also be in the best interest of M⬛, who remains primarily with Mother. Given her history of psychological needs, this court firmly believes that this custodial arrangement will give

Mother a greater opportunity to devote more one-on-one attention to Morgan in the hope that Morgan's psychological issues will become under control.

This court recognizes that when both parents are otherwise fit, one parent's role as the primary caretaker may be given weight as the determining factor in a custody case. *See* <u>Wheeler v. Mazur</u>, 793 A.2d 929, 935 (Pa.Super. 2002) (*quoting* <u>Wiseman v. Wall</u>, 718 A.2d 844, 851 (Pa.Super. 1998). However, a parent's role as the primary caretaker does not outweigh the other factors in the best interest analysis. *See* <u>S.J.S. v. M.J.S.</u>, 76 3d 541, 551 (Pa. Super. 2013).

In the instant case, this court does not feel that the home environments in both households are equal in their ability to foster the wellbeing of the children. It is this court's intention, by transferring primary physical custody of Emmy and Cole to Father, to give them a fresh start in a more stable and supportive household where their physical and emotional needs are more likely to be addressed, while continuing their relationship with Mother, which this court believes, Father is more likely to promote.

As stated previously, this court did not disturb the primary custody of Morgan with Mother as we took into consideration Morgan's preference not to live with Father, Morgan's psychological issues, and the conflict ridden history of her relationship with Father, and her age. The disruptive effect of Morgan's psychological problems on the two younger children was of paramount concern for this court when ordering the separation of the siblings. Accordingly, this court found that the evidence of record provides compelling evidence and supports our transfer of primary custody to Father resulting in a separation of siblings during the week.

33

Mother avers in her second issue, that the trial court abused its discretion and erred as a matter of law and fact in entering an order for the relocation of the parties' two younger children to Maryland. This court determined that the relocation factors pursuant to 23 Pa.C.S. 5337 do not apply. Father has been residing in Maryland since prior to the initial filing in Philadelphia in April 2011. Mother had relocated from Virginia to Pennsylvania, while Father continued to live in Maryland. The children have been familiar with Father's home and community since they have been travelling to Maryland from Pennsylvania for Father's custody periods for nearly four years. Over the course of these years, Emily and Cole have developed a bond with their Stepmother and stepbrother, Kyle. Neither party raised relocation issues during the pendency of the proceedings. The final order entered on June 3, 2014, is primarily a reversal of primary custody from Mother to Father which is not affected by their respective residences.

Mother's third issue in her Concise Statement of Errors alleges that the trial court erred as a matter of law and fact when it precluded Mother from submitting testimony and evidence in support of her case for custody and Father's contempt. Mother was represented by competent counsel at four of the five custody hearings in this matter. She discharged her attorney prior to the hearing on Father's petition for contempt on April 29, 2014. This court heard testimony from Mother and from Mother's witnesses during the course of five hearings, and considered all the exhibits entered into evidence on her behalf. The court accepted Mother's Answer and Counterclaim to Father's petition for contempt at the hearing on April 29, 2014, over Father's counsel's objection that Mother failed to sign a verification to her pleading. (N.T. 04/29/14 at 7). Moreover, this court refused to review or to consider Mother's mental health records pursuant to Father's

34

counsel's Motion for Special Relief heard on June 11, 2013. The record reflects that Mother participated fully in all hearings on all pending petitions and that there is no factual basis for this allegation.

Mother's fourth issue claims that this court erred as a matter of law and fact in finding Mother in willful contempt of the custody order and directing Mother to pay Father's counsel fees. Under Pa.R.C.P. 1915.12, a court may hold a party in civil contempt for the willful disobedience of a custody order. In reviewing this court's finding of contempt, the scope of review of the Superior Court is narrow and must be based on a determination of whether the trial court committed a clear abuse of discretion. Hyle v. Hyle, 868 A.2d 601 (Pa. Super. 2005), *appeal denied*, 890 A.2d 1059 (2005). In addition, the reviewing court must place great reliance on the sound discretion of the trial judge. *See* Goodman v. Goodman, 556 A.2d 1379, 1391 (Pa.Super. 1989). In order to sustain a finding of civil contempt, the complainant must prove certain distinct elements by a preponderance of the evidence: (1) that the contemnor had notice of the specific order or decree which she is alleged to have disobeyed; (2) that the act constituting the contemnor's violation was volitional; and (3) that the contemnor acted with wrongful intent. Stahl v. Redcay, 897 A.2d 478, 489 (Pa.Super. 2006).

The evidence in this case clearly demonstrates Mother's history of making unilateral decisions changing Father's custodial periods with the children. Despite the evidence regarding additional instances wherein Mother willfully disobeyed the court order, this court held Mother in contempt for only one incident: her willful refusal to transport the parties' children to Father on Friday, February 28, 2014, which was not excused by her

35

unilateral invocation of the Weather Clause. We find Mother's conduct to be a flagrant violation of this court's authority. Moreover, the financial sanction that we imposed is consistent with the terms of the parties' agreed order of July 31, 2012.

Mother contends in her final issue on appeal that the court abused its discretion and erred as a matter of law and fact in not finding Father in willful contempt of the custody order. In her Petition for Contempt filed December 27, 2013, Mother makes the following averments:

1. The Respondent continues to communicate in an abusive and intimidating way to both the Petitioner and their 13 year old daughter. The Respondent refuses to provide any proof of attending counseling, but has indicated that his "counselor" has diagnosed the Petitioner with Borderline Personality Disorder, having never met or spoken with her.
2. The Respondent refuses to be flexible for compromise for the children's events or to changing circumstances such as the Petitioner's severe back injury and inability to provide transportation.
3. The Respondent is extraordinarily abusive to our 13 year old daughter and has sent emails indicating that he believes Petitioner is trying to diminish his role as Father.
4. Respondent refuses to modify the transportation and threatens contempt when we are late due to traffic.

In reviewing the voluminous record in this matter, and after making findings of credibility, this court finds that Mother did not meet her burden of proving the above-cited allegations by a preponderance of the evidence.

The trial court asserts that it did not err in entering its order for custody of June 3, 2014, and respectfully requests that the order be affirmed and that Mother's appeal be dismissed.

36

BY THE COURT:

DATE: September 2, 2014

DIANE THOMPSON, J.